

EXHIBIT
**D**

# Transcript of the
# 30(b)(6) Deposition of
# **Kimberly Hills Mobile Home Park by and through Tanya Wiebold**

**Date:** June 15, 2016

## Riverside Storage, et al. v. City of Federal Heights, et al.

## Civil No. 1:15-cv-02325-CMA-NYW



*Mile High*
Court Reporting & Video, Inc.

14143 Denver West Parkway, Suite 100 • Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-02325-CMA-NYW

_____

30(b)(6) DEPOSITION OF KIMBERLY HILLS MOBILE HOME PARK
THROUGH TANYA WIEBOLD - VOLUME
June 15, 2016

_____

RIVERSIDE STORAGE AND RECYCLING CENTER, a Colorado
Limited Liability Corporation; and
CRAIG SHRIVER, individually; and
KEVIN COX, individually; and
JOHN HOOD, individually; and
KIMBERLY HILLS MOBILE HOMES PARK, a Foreign Limited
Liability Company,
Plaintiffs,

vs.

CITY OF FEDERAL HEIGHTS, a Colorado Municipal
Corporation;
KEN EKROSS, in his individual capacity;
JACQUELINE HALBURNT, in her individual capacity;
KRISTEN TEAGUE, in her individual capacity;
KAREN JACKSON, in her individual capacity;
TERESA GARRAMONE, in her individual capacity;
TIMOTHY WILLIAMS, in his individual capacity;
STEVEN DURIAN, in his individual capacity; and
JOHN DOE, whose true name is currently unknown, in his
individual capacity,
Defendants.

_____

PURSUANT TO NOTICE, the 30(b)(6) deposition
of KIMBERLY HILLS MOBILE HOME PARK through TANYA WIEBOLD,

called for examination by the Plaintiff herein, was

taken at the offices of Nathan Dumm & Mayer, 7900 East

Union Avenue, Suite 600, Denver, Colorado, commencing at

10:09 a.m., on Wednesday, June 15, 2016, before

Teresa Hart, a Registered Professional Reporter and

Notary Public in and for the State of Colorado.

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

2

```
 1    APPEARANCES:

 2            AIMEE M. BOVE, ESQ.
              BKN Murray, LLP
 3            6795 East Tennessee Avenue, Suite 330
              Denver, Colorado  80224
 4            303-758-5100
              above@bknmurray.com
 5
                        For the Plaintiffs
 6

 7            J. ANDREW NATHAN, ESQ.
              BRENDEN DESMOND, ESQ.
 8            Nathan Dumm & Mayer, P.C.
              7900 East Union Avenue, Suite 600
 9            Denver, Colorado  80237-2776
              303-691-3737
10            anathan@ndm-law.com
              bdesmond@ndm-law.com
11
                        For the Defendants
12

13            PATRICK A. SINGER, ESQ.
              Pryor Johnson Carney Karr Nixon, P.C.
14            5619 DTC Parkway, Suite 1200
              Greenwood Village, Colorado  80111
15            303-773-3500
              psinger@pjckn.com
16
                        For Defendant Steven Durian
17

18            Also Present:  Tim Williams
19

20

21

22

23

24

25
```

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

49

1   up.  There were water marks on the homes.
2       Q.   So you saw some of these homes with water
3   marks on them?
4       A.   Yes.
5       Q.   They were above the floor lines?
6       A.   Yes.
7       Q.   Some of them were how high?
8       A.   Maybe a foot, two feet.
9       Q.   And were you aware that some of these
10  homes had sat in water for over 10 days?
11      A.   I understood it to be one week, five to
12  seven days.
13      Q.   Were you aware that they had been -- that
14  the water that had flooded them had pesticides in it?
15      A.   No, I was not aware of that.
16      Q.   Okay.  Would that have concerned you?
17      A.   No.  I didn't really have concerns about
18  any of that because a lot of items were removed from
19  the homes before they were even brought in.
20      Q.   Okay.  Did you learn that the areas in
21  Evans where these homes were flooded also contained oil
22  and gas facilities, and that they were contaminated
23  with oil and gas products?
24      A.   No, I'd never heard that.
25      Q.   Would that have concerned you had you

50

1   known it?
2       A.   Not any more than anything else.
3       Q.   You did learn that there was flooding of
4   a sewage treatment plant, correct?
5       A.   I did hear that, yeah.
6       Q.   And that these homes were contaminated in
7   that way.
8       A.   That it was possible, yes.
9       Q.   Did you learn that some of these homes
10  sustained structural damage because they were washed
11  off their foundations?
12      A.   No, I don't understand it that way.
13      Q.   What did you understand about any
14  structural damage?
15      A.   Water damage.  Because these homes are
16  not set on a foundation like you're speaking of,
17  they're set on blocks.  They're still movable.  That's
18  not a foundation.
19      Q.   Okay.  I'll rephrase the question.  Did
20  you learn that some of these homes had been washed off
21  their blocks, thereby sustaining structural damage?
22      A.   Okay.  I guess I don't understand how
23  that causes structural damage.  The structural damage
24  that I was aware of was any water damage.
25      Q.   All right.  Did Kimberly Hills ever do an

51

1   investigative report on mold?
2       A.   Did Kimberly Hills?  No.
3       Q.   Yes.  Did someone do it?
4       A.   Someone did, yes.
5       Q.   Do you know who?
6       A.   There was (sic) homeowners that had done
7   them.
8       Q.   Well, there's a report in documents that
9   you've produced from RDS Environmental called Indoor
10  Environmental Mold Investigation Report.
11      A.   Yes.
12      Q.   Do you know who paid to have that done?
13      A.   I believe it was Zinc Homes, Z-I-N-C.
14      Q.   And if you know, why would Zinc Homes
15  want to do an environmental report?  Did they buy some
16  of these flooded homes?
17      A.   They did.  They bought two.
18      Q.   And did they bring them to Kimberly
19  Hills?
20      A.   Yes, they did.
21      Q.   And then was this report done after they
22  were brought to Kimberly Hills?
23      A.   Yes.
24      Q.   All right.  And did you ever see this
25  report?

52

1       A.   Yes.
2       Q.   Okay.  And did the findings concern you
3   at all?
4       A.   Yes and no.  That particular home had not
5   had any work done to it, any remodeling done to it,
6   so -- and my understanding is that they had that report
7   done because of the letter that came from City of
8   Federal Heights about what remodeling did need to be
9   done to these homes to pass city inspections.
10      Q.   Okay.  You said that you heard some of
11  the homes had been flooded two feet, correct?
12           MS. BOVE:  Objection.  Misstates earlier
13  testimony.
14           MR. NATHAN:  I'll rephrase it.
15      Q.   (By Mr. Nathan)  You said you saw
16  evidence that some of these homes had been flooded
17  two feet.
18      A.   One to two approximately.
19      Q.   Over the floor?
20      A.   Over the floor.
21      Q.   Anything higher than that?
22      A.   I don't remember ones being higher than
23  that.
24      Q.   Who is Chris Batchelder?
25      A.   He works for Zinc Homes.

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

53

1    Q.   So Zinc Homes went in and had this
2  testing done, correct?
3    A.   Yes.
4    Q.   And then they shared the results with
5  you?
6    A.   Yes.
7    Q.   And what happened to these two units?
8    A.   They were red-tagged by the City of
9  Federal Heights to be removed.
10   Q.   And were they removed?
11   A.   Yes.
12   Q.   And do you know if they were red tagged
13  based upon this report or some other reason?
14   A.   My understanding is it was because of the
15  letter from the City of Evans.
16   Q.   Okay.
17       (Exhibit 2 was marked.)
18   Q.   (By Mr. Nathan)  All right.  Is Exhibit 2
19  the report done for Zinc Homes on what appear to be
20  units 158 and 471?
21   A.   Yes.
22   Q.   And by 158 and 471, we're referring to
23  the lot numbers they're in?
24   A.   Yes.
25   Q.   One of the reports indicates that -- and

54

1  this is on page 414, which is the Bates number ...
2    A.   Okay.
3    Q.   Visual observation says, both had visible
4  mold growth, that's the last bullet point, in several
5  areas on exposed frame members and wall board where the
6  flood damage was higher than the flood out (sic).  Do
7  you know what that meant?
8    A.   Flood cut?
9    Q.   Is that cut?
10   A.   Yeah, that's cut.  Before the homes left
11  the parks in Evans, they removed a lot of items from
12  the homes that had any water damage.  And so that
13  included drywall where they just cut it and removed it
14  above the water line.
15   Q.   Okay.  These homes had mold above the cut
16  line, correct?
17   A.   That's what it says, yes.
18   Q.   Do you have any reason to disbelieve it?
19   A.   No.
20   Q.   All right.  You know what Conditions 1,
21  2, and 3 are?
22   A.   On that same page?
23   Q.   It's on the next page.
24   A.   Next page.  No, I do not know what that
25  means.  Although it does explain it right below that.

55

1    Q.   My question was more, did you know what
2  it meant?  And you can read the report and find out.
3  But did you know back then what it meant?
4    A.   No.
5    Q.   Did you do any further investigation
6  regarding this report?
7    A.   Did I, no.
8    Q.   Did someone else?
9    A.   I don't know.
10   Q.   You mentioned red tagged.  And I want to
11  make sure we understand what red tagging is.  The City
12  of Federal Heights has a red tag it puts on places
13  where you cannot do work on it, correct?
14   A.   Correct.  Stop work order?
15   Q.   Yes.
16   A.   Yes.
17   Q.   Is that the red tag you're referring to?
18   A.   Yes.
19   Q.   Is there another way that the City of
20  Federal Heights, to your knowledge, identifies homes
21  that have to be removed from the city?
22   A.   They'll write a letter and send it by --
23  sometimes by e-mail, and also usually regular mail
24  they'll send me notices.
25       (Exhibit 3 was marked.)

56

1    Q.   (By Mr. Nathan)  So Exhibit 3, is this
2  one of the notifications you got from Federal Heights?
3    A.   Yes.
4    Q.   And do you know by whom this was sent?
5    A.   I believe it was Steve Durian.
6    Q.   On page 2 it says Ken Ekross.
7    A.   Oh, okay.
8    Q.   Do you believe that that's who it was
9  sent by?
10   A.   Okay, yes.  My mistake.  Wrong letter.
11   Q.   And then it encloses a list of
12  flood-damaged Tier 1 debris located in Federal Heights;
13  do you see that?
14   A.   Yes.
15   Q.   All right.  Apparently there was a list
16  of 208 flood-damaged homes by the State in Weld and
17  Boulder County; is that correct?
18   A.   Okay.
19   Q.   Did you ever see that list?
20   A.   I did.
21   Q.   Okay.  Is that the list you attached to
22  the complaint?
23   A.   Yes.
24   Q.   All right.  So that was Exhibit A to the
25  complaint, right?

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)